UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

02 FEB 28 PM 5: 43

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DELILAH GLOVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 01-BU-1071-E |
| | ) | |
| HONEYWELL, INC. | ) | **ENTERED** |
| | ) | MAR 0 1 2002 |
| Defendant. | ) | |

# MEMORANDUM OPINION

In the above-styled action, Plaintiff Delilah Glover brings claims alleging that her

employer Honeywell International, Inc. subjected her to racial discrimination and is liable

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.

("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). In particular, Plaintiff claims that (1)

Defendant paid her less than similarly-situated non-minority employees, (2) Defendant twice

failed to promote her and once demoted her because she is black, and (3) Defendant demoted

her in retaliation for her engaging in statutorily protected activity. Now before the Court is

Defendant's motion for summary judgment on all claims. (Doc. 43). The parties have

submitted evidence and briefs in support of their respective positions on the motion, which

is now ripe for decision. In addition, Defendant has also filed a motion to strike Plaintiff's

errata sheet. (Doc. 59). After careful consideration of all relevant materials, the Court

concludes that Defendant's motion for summary judgment is due to be GRANTED, and that

Defendant's motion to strike is due to be DENIED.  The Court's reasoning follows infra.

## I. BACKGROUND[1]

Plaintiff, a black female, began working for Honeywell in 1987 as an "HR

Coordinator" at the Allied Signal[2] Anniston, Alabama "aftermarket" facility.[3]  In 1986

Plaintiff began working for Defendant as a Shipping Clerk.  In 1987 she was promoted to the

position of HR Assistant.  The HR Assistant position appears to have been a clerical position,

supporting the HR Generalist at the site.  In 1988 Plaintiff's job title changed to HR

Associate, and in 1993 changed again to HR Coordinator.  Between 1993 and 1997 Glover

worked as HR Coordinator under the supervision of HR Generalist Melissa Hart.[4]  By all

accounts, Glover was an above-average HR Coordinator, consistently earning favorable

---

[1]"The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only.  They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[2]In December 1999, Honeywell, Inc. merged with Allied Signal, Inc. and the new company became known as Honeywell International, Inc.  The new entity is the Defendant in the instant litigation.

[3]The aftermarket facility is also known as the "R&O" facility.

[4]The parties dispute the nature of the HR Coordinator position.  Plaintiff contends that the duties attending the position involved substantive human resource department work as well as clerical work, while Defendant holds that the position was essentially no different from the previous HR jobs held by Plaintiff, in that the Coordinator position was mainly clerical and devoid of any substantive HR responsibility.  It is undisputed that the Coordinator position involved less final decision-making authority than the Generalist position.  The Generalist position was the next highest-ranking Human Resource position at the Anniston site, above the Coordinator position.

reviews from Hart. In 1997 Glover was promoted from HR Coordinator to HR Generalist when Defendant transferred Hart to Phoenix, Arizona.

When Plaintiff assumed the title of HR Generalist, the position was a "Band Three" salary position. It seems that the salary range corresponding to Band Three was between $40,000.00 and $80,000.00 per year.[5] Plaintiff's starting salary in the HR Generalist position was set at $42, 517.73 as of February 3, 1997.[6] Although it is not clear what Hart's starting salary was, her salary as of mid-1996 was $71, 244.00.[7]

Early on in her tenure Plaintiff became aware of the disparity between her new starting salary and Hart's salary in the HR Generalist position.[8] Plaintiff alleges that Melissa Hart, Bill Higgins (the Anniston facility Site Leader), and Mark Nicholls (then - HR Director of the

---

[5]Plaintiff cites to the 1999 posted job description for a newly-constituted HR Generalist position to support her claim that the salary range for the HR Generalist position in 1997 was between $50,000.00 and $80,000.00. Plaintiff's Brief, at p. 39. Defendant cites to the Deposition of Wendy Graham as support for their contention that the HR Generalist salary range was between $40,000.00 and $70,000.00. Defendant's Reply Brief at 20. In Defendant's Position Statement to the EEOC, Defendant stated that Salary Band 3 covered job classifications between $25,000.00 and $90,000.00. Deposition of Jim Williams, Tab "G" of Plaintiff's Evidentiary Submission, Exhibit 2, p. 6.

[6]Plaintiff also received a lump sum monetary award of $3,826.60 together with her promotion and salary raise.

[7]Plaintiff states that Hart's starting salary as a Generalist was $64,008.00. Plaintiff's Brief at p. 38. However, the evidence cited does not support that contention.

[8]The Court is aware that Defendant claims the Generalist position was somehow reconstituted after between Hart's departure and Plaintiff's succession. Defendant's Reply Brief, p.6. Defendant avers that the old HR Coordinator position held by Glover was actually combined with the old HR Generalist position held by Hart, and that Glover assumed this new combined position in early 1997. It seems that, by definition, this new position would have entailed *more* responsibility than the old HR Generalist position vacated by Hart, rather than *less* responsibility as Defendant suggests.

Anniston site) promised to review her HR Generalist salary every six months in order to assure eventual parity between Glover and Hart's former salary.  Plaintiff contends that this promise of salary review and increase was predicated on expediting the increase process and that such promise was the primary reason she agreed to take the HR Generalist position. Approximately six months after filling the HR Generalist position, Plaintiff began complaining about her salary to Nichols.  She complained that her salary was too low relative to that of other department supervisors (other members of the "Leadership Team"), as well as relative to what Hart's salary had been in the same position.  In an e-mail dated October 6, 1997, Plaintiff wrote Nichols and reminded him of his commitment to review her salary. Deposition of Mark Nichols, Tab "B" of Plaintiff's Evidentiary Submission, Exhibit 9. Further, she furnished Nichols with comparative salary data, as he had requested in an earlier conversation with her.[9]  In response to Plaintiff's criticism, Nichols awarded her an 8.2 % base salary increase, bringing her salary up to $46,000.00 per year.  Deposition of Mark Nichols, Tab "B" of Plaintiff's Evidentiary Submission, Exhibit 53.

In August, 1998, Plaintiff again complained to Nichols about her salary relative to the other members of the Leadership Team.  Plaintiff appears not to have received a response to

---

[9]Plaintiff attached a data table to her e-mail outlining the salaries and last percentage salary increase of each member of the Leadership Team.  This list included: Ron Morgan, Customer Service Leader (base salary of $98,000.00); Jim Harris, HS&E Leader (base salary of $85,000.00); Jon Snodgres, Finance Leader ($80,136.00); Randall Macintosh, Engineering Leader (base salary of $75,356.00); Don Jones, OCI Leader ($67,320.00); Steve Langston, Mtl. Leader (base salary of $56,000.00); Cathy Langston, Information Systems Leader (salary of $50,000.00); and Plaintiff, HR Team Leader (salary of $46,000.00).  Deposition of Mark Nichols, Tab "B" of Plaintiff's Evidentiary Submission, Exhibit 10.

her queries.  On September 27, 1998, Plaintiff sent Bill Higgins an e-mail expressing her concern over Nichols's inattention to her complaints.  Deposition of Mark Nichols, Tab "B" of Plaintiff's Evidentiary Submission, Exhibit 9.  In that e-mail, Plaintiff noted that she had been trying to rectify the matter with Nichols since June of 1998.  It is not clear whether Higgins ever responded to Plaintiff's email, but she appeared to believe that the issue of her compensation level still had not been addressed adequately by the beginning of 1999.

On February 2, 1999, Plaintiff sent a detailed e-mail to James Williams, the new Human Resources Director for the Anniston site, outlining her position with respect to her salary.  After roughly five weeks, Williams replied to Plaintiff.  Williams's March 8, 1999 e-mail to Plaintiff states: "Delilah, with the current reorganization activities, I think it best to wait and see how all positions look in the new organization before any compensation readjustments are made.  Everything is in a state of flux.  Please be assured that I have not forgotten about your situation.  Thanks, Jim."  Tab "G," Ex. 19 of Plaintiff's Evidentiary Submission.

Plaintiff reasserted her complaints regarding her salary in the Spring of 1999.  In May of 1999, Plaintiff assisted an outside consultant in compiling data to be used to prepare for an audit by the United States Department of Labor.  The information compiled by Plaintiff revealed, among other facts, that white managers were being paid far more than black managers, and that male managers were being paid much more than female managers at the Anniston site.  Plaintiff brought the data to the attention of both Williams and Allen Clarke,

Defendant's in-house counsel, in May or June of 1999. On June 25, 1999, Plaintiff received notice that she was receiving a 30.44% salary increase, raising her annual base salary to $60,000.00. Williams stated that he had been hesitant to grant Plaintiff's earlier requests for a salary increase because it might have communicated to Plaintiff that her performance was praiseworthy, when he believed that it was not. Williams eventually acquiesced to Plaintiff's salary increase request because "it would be safer and more palpable to confer an increase than to perpetuate the concern that [Glover] had about being unfairly disadvantaged, and what those implications might be."

On August 3, 1999, Plaintiff and Williams met pursuant to the latter's request. At this meeting, Williams told Plaintiff that the HR Leader positions[10] for Defendant's two Anniston facilities (the "aftermarket" or "R&O" facility, at which Plaintiff was located, and the "depot" or "OEM" site) would be collapsed into one position. The new combined position was similar to the prior distinct HR Generalist positions, save that the new position was responsible for supervising two sites rather than one. Plaintiff avers that this meeting was the first time she had heard of such alleged "reduction in force" ("RIF").[11] Moreover, Williams told Plaintiff that Scott Connell, the HR Leader of the depot facility, would henceforth be the HR Leader of both sites.[12] The "new position" was not posted; rather, Defendant alleges that only

---

[10]HR Leader appears to have been another name for the HR Generalist position.

[11]Defendant maintains that Plaintiff was told about the decision in April of 1998.

[12]Connell, a graduate of Jacksonville State University, came to Allied Signal in 1997 with approximately eight years of human resource experience. In his capacity as HR Generalist for the

Plaintiff and Connell were considered for the new position out of concern for fairness. Plaintiff was told that she could either accept a transfer to the position of Customer Service Account Manager, or be terminated and receive a severance package. According to Plaintiff, Williams also told Plaintiff that she was not selected for the new combined position because she "did not fit the profile," and he told Plaintiff a "story about the South, and how far the South had to come." Glover Depo, Tab "A," pp. 180, 182-83 Plaintiff's Evidentiary Submission. Plaintiff contends that Williams also asked her if "she was upset because she was being replaced by a white male." Errata Sheet, Tab "I" of Plaintiff's Evidentiary Submission at p. 4

Rather than accept termination, Plaintiff opted to be transferred to another position in a non-human resource department. Plaintiff became a Customer Service Account Manager, and retained her $60,000.00 base salary. The Customer Service position was in the Band Three salary range. A job posting dated September 1999 for the Customer Service Account Manager position indicates that the salary range for the position was between $20,000.00 and $80,000.00. Defendant contends that the actual salary range was capped at $60,000.00 for the position, and that the range listed in the job posting referred not to the range for the Customer Service position, but to the bounds of Band Three positions. Nevertheless, Plaintiff's salary was "red-circled," meaning that she was not eligible for a base-pay increase until the salary range for the position was adjusted upward. Since being transferred into the

---

Anniston OEM facility he had responsibility for between 30 and 60 employees. The HR Generalist position at the Aftermarket facility involved supervision of roughly 200 persons.

Customer Service position, Plaintiff has not received a base pay increase, but she has received two lump-sum "bonuses" of $3,600.00 and $2,800.00 in 2000 and 2001 respectively. At least one other Customer Service Account Manager, a white male named Ron Morgan, receives a base salary in excess of $60,000.00.

In November 1999, Connell resigned from his position of combined HR Leader for Defendant's two Anniston sites. The job opening was then posted, and three individuals applied for the position. Plaintiff, Ken Harness, a white male, and Wendy Graham, a white female, submitted application materials for the position to Williams. Williams was responsible for passing the application materials to Scott Thompson, the manager responsible for scheduling the candidates' interviews. Ken Harness had once been an HR Generalist, and did not possess a college degree. Wendy Graham had served as HR Generalist for one and a half years, and she possessed an undergraduate degree from Bates College and a Master's of Business Administration with a concentration on Human Resource Management from Cornell University.[13] The job posting indicated that an undergraduate degree with a major in business or human resources, or a bachelor's degree and an MBA would be "preferred." Plaintiff had a high school diploma.

---

[13]Graham began her employment with Defendant immediately after completing graduate school. She was placed in what is known as the "Pathways" program, a three-year program in which "future leaders" of Defendant's organization were groomed by rotating through a number of different work groups at different facilities for three years. At the time she was promoted to HR Leader, Graham had completed between one and a half and two years of the program. Graham served as an undergraduate and graduate recruiting manager for Defendant in one rotation. Graham's HR Generalist experience had been split between military and commercial R&O facilities in other rotations. Graham Depo. pp. 36-46.

Williams never told Thompson that Plaintiff had applied for the position.[14]  Both Graham and Harness were evaluated on a number of quantitative axes as part of what was labeled a "pre-screen" test. In addition, both Harness and Graham were compared on a "final selection matrix," which took into account each candidate's interview score results. Plaintiff was never interviewed for the position. It does not appear from the relevant documents that Plaintiff was considered for the position at any stage of the application process, or that anyone at Honeywell knew that Plaintiff had applied for the position except for Williams.

As Graham's scores all were superior to Harness's, Graham was awarded the position. As of the time this litigation was commenced, Plaintiff served as a Customer Support Representative.

## II. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A party seeking summary

---

[14]It is not clear whether Plaintiff submitted a resume to Williams, or that her resume was withheld by Williams. Graham testified that she submitted her resume to Williams, and that he forwarded it to Thompson.

judgment has the initial responsibility of informing the Court of the grounds for the motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. However, "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." Jones v. Sheehan, Young & Culp, P.C., 82 F.3d 1334, 1338 (5th Cir. 1996); see also Resolution Trust Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), cert. denied sub. nom., 516 U.S. 817 (1995).

Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

### III. DISCUSSION & ANALYSIS

Under Title VII, it is unlawful for an employer "to discharge any individual, or

otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Section 1981 guarantees to all persons in the United States "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).  Following the passage of the Civil Rights Act of 1991, the term "make and enforce contracts" has been broadly defined as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  Claims of disparate treatment on the basis of race under Title VII and Section 1981 require the same proof to show liability. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

Under Title VII, a plaintiff is not required to prove that race was the sole reason for the employer's challenged decision.  Instead, the plaintiff need only show that race was a motivating factor in the employer's decision.  See 42 U.S.C. § 2000e-2(m).  To make this showing, the plaintiff may present either direct or circumstantial evidence of discrimination.

The applicable legal standard varies with the type of evidence adduced by the plaintiff. Direct evidence is "evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption.  Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quoting Merritt v. Dillard Paper Co., 120 F.3d

1181, 1189 (11th Cir. 1997)).  If the plaintiff offers direct evidence and the trier of fact accepts that evidence, then the plaintiff has proven direct discrimination.  See McCartheny v. Griffen-Spalding County Bd. of Educ., 791 F.2d 1549, 1553 (11th Cir. 1986)).  Circumstantial evidence means "[e]vidence of facts or circumstances from which the existence or non-existence of fact in issue may be inferred." Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (quotation omitted).  In cases involving circumstantial evidence, the plaintiff may rely upon the McDonnell Douglas burden-shifting analysis to raise an inference of racial discrimination.  McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Under McDonnell Douglas, the employee has the initial burden of establishing by a preponderance of the evidence a prima facie case of a practice proscribed by Title VII.  Many articulations of the prima facie case exist, but the essence of the prima facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact finder that the employer used prohibited criteria in making an adverse decision about the employee.  If established, the prima facie case raises a presumption that the employer is liable to the employee under Title VII.  See Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

The burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took unlawful action against the employee.  The employer can meet this burden of production by articulating a

legitimate, nondiscriminatory reason for the employment decision – a reason which is clear, reasonably specific, and worthy of credence. The rebuttal burden is one of production only, and the employer does not have to persuade the Court that it was actually motivated by the proffered reason. See Burdine, 450 U.S. at 253-55. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Burdine, 450 U.S. at 254-55). Thus, the Eleventh Circuit has characterized the employer's burden at this intermediate stage as "exceedingly light." Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997); Perryman v. Johnson Prods. Co., 698 F.2d 1138, 1142 (11th Cir. 1983).

Once the employer satisfies this burden of production, the employer defeats the presumption of intentional discrimination created by the prima facie case. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993). The focus shifts to the employee, who retains the ultimate burden of proving by a preponderance of the evidence that the employer's proffered reason for its employment decision is a pretext for discrimination. The employee may meet this burden by persuading the fact finder directly that a discriminatory reason more than likely motivated the employer, or indirectly that the proffered reason for the employment decision is not worthy of belief. See Burdine, 450 U.S. at 256. Notwithstanding the shift in the burden of production subsequent to the employee's presentation of a prima facie case, the employee retains the ultimate burden of persuasion on the question of whether discrimination occurred. See St. Mary's Honor Center, 509 U.S. at 511.

In this lawsuit, Plaintiff advances several claims, each identifying a different action by Defendant that allegedly constitutes discrimination in violation of Title VII. Plaintiff claims that Defendant has violated her statutorily-protected rights in the following ways: (1) by discriminating against her with respect to her salary as an HR Generalist; (2) by discriminating against her by not promoting her to the combined HR Leader/Generalist position in August of 1999; (3) by discriminating against her by not promoting her to the combined HR Leader/Generalist position in November of 1999; (4) by discriminating against her by demoting her to the Customer Service Account Manager position; (5) by demoting her in retaliation for exercising her right to secure non-discriminatory pay, and (6) by failing to consider Plaintiff for the November 1999 promotion to the combined HR Leader/Generalist position in retaliation for her participating in protected activity. The Court will address each of Plaintiff's claims seriatim.

A. Discrimination in Pay as HR Generalist

Plaintiff was promoted into the HR Generalist position vacated by Melissa Hart in early 1997. In addition to the duties that Hart had performed, Glover continued to perform all of the duties for which she had been responsible as HR Coordinator. Although Hart's starting salary is not entirely clear, after Hart had been HR Generalist for roughly two years, her base salary was $71,244.00. Glover's starting salary in the HR Generalist position was $42,517.73, and, ten months later, she received a base salary increase moving her salary up to $46,000.00. Defendant did not increase Plaintiff's salary again until June of 1999, one and a half months

before she was moved into the Customer Service position.  Plaintiff also contends that, even after her base pay was increased to $60,000.00 for the final six weeks of her tenure as HR Generalist, her salary was still too low as compared with other non-minority managers employed by Defendant.

Essentially, Plaintiff argues that she was discriminated against because three other non-minority individuals -- Melissa Hart, Scott Connell, and Wendy Graham -- were paid salaries far in excess of Plaintiff's salary for doing allegedly identical work.[15]  Plaintiff also points to at least one other member of the Leadership Team, Randall Macintosh, who earned a $75,356.00 base salary as Engineering Leader prior to having earned a college degree. Defendant argues (1) that Plaintiff's wage claim for the HR Generalist position is time-barred, (2) that Plaintiff's prima facie case of wage discrimination is infirm, and (3) that Defendant based Plaintiff's relatively low pay on her inferior educational background – a legitimate, nondiscriminatory factor.  The Court will assume that this wage claim is timely, but, for the reasons limned below, it concludes that Defendant is entitled to summary judgment on such claim.

In order to establish a prima facie case of racial discrimination based on differences in salary "the plaintiff must show that he was paid less than a member of a different race was paid for work requiring substantially the same responsibility."  <u>Pittman v. Hattiesburg</u>

---

[15]Connell's salary during his short tenure as HR Leader for the Anniston facilities was $77,000.00.  Graham's starting salary was $77,000.00 and, by November 1, 2001, had a base salary of $87,300.00.

Municipal Separate School District, 644 F.2d 1071, 1074 (5th Cir. May 13, 1981).[16] Viewing the facts in the light most favorable to Plaintiff, as the Court must do at this stage in the litigation, the Court concludes that Plaintiff has failed to satisfy this burden with respect to each proffered comparator except for Hart.

First, Plaintiff has offered no argument or evidence to support a finding that Randall Macintosh's position as Engineering Team Leader was in any way similar to Plaintiff's position as HR Generalist. Plaintiff has also not adduced any evidence that would make the salaries of other members of the Leadership Team representing different departments probative of her HR Generalist wage claim. The mere fact that Macintosh received a higher base salary than did Plaintiff without holding a college degree is meaningless with respect to advancing Plaintiff's prima facie wage claim for the HR Generalist position.[17]

Second, Connell and Graham are also not proper comparators for Plaintiff's HR Generalist wage claim. The HR Generalist position as reconstituted in August of 1999,

---

[16]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[17]Aside from the fact that there is no evidence that Macintosh performed substantially similar work as did Plaintiff, the lone fact of Macintosh's relatively high salary would not help Plaintiff's cause even at the pretext stage. For example, if Plaintiff were to present evidence that another Engineering Team Leader who did have a college degree received a base salary equal to or less than that of Macintosh, Plaintiff could advance the argument that, even though Macintosh is not a proper direct comparator for Plaintiff, such evidence is probative of Defendant's valuation of education in compensating its employees. Plaintiff would potentially be able to use such evidence at the pretext stage to rebut Defendant's proffered justification for paying premiums for college education. However, Plaintiff has not attempted to fashion such an argument and Macintosh's salary is of no value with respect to the purpose for which it is offered.

combined the responsibilities of both the previous HR Generalists for the depot facility and for the aftermarket facility. Therefore, the combined position was therefore responsible for supervising approximately 30% more employees. Also, the combined position involved multi-site supervision. The oversight of multiple facilities simultaneously alters the position in kind and not just in degree. In his deposition, Williams explained: "I would suggest that there are exponential complications by having multi-site accountability reporting to [ ] different business units [compared with] an incremental addition of . . . 60 more people." Williams Depo. p. 165.[18]

That the new HR Leader position was substantially different from the previous position

---

[18]In her Brief, Plaintiff notes that when she was an HR Generalist she once managed Defendant's Burbank, California facility while also managing the Anniston facility. See Plaintiff's Brief pp. 50-51. Plaintiff does not mention any details of this dual-site supervisory stint, such as how the added responsibilities were offered to her, when she took on the Burbank facility duties, when and why she ceased supervising the Burbank facility, how much traveling between sites she did, or otherwise how much the added responsibility increased her existing workload.

In addition, it seems that both Williams and Plaintiff's counsel Ms. Hattaway agreed that Plaintiff had no prior multi-site managerial experience at all: "Q. [ ] But Ms. Glover had had experience in that role, correct? A. Ms. Glover did not have multi-site experience. Q. Which Mr. Connell did not [have] *either*, as you testified earlier, correct?" Williams Depo. p. 164 (emphasis added).

Nonetheless, because Glover vaguely alludes to the Burbank experience, the Court is constrained to view that fact as being in dispute. However, it is irrelevant to Plaintiff's prima facie case of wage discrimination, as it is not at all clear that any such dual-site supervisory duties were a part of Plaintiff's HR Generalist position. Without more evidence, any comparison between the multi-site experience performed by Plaintiff and that performed by Connell and Graham in the new position is rank speculation. It is therefore not surprising that Plaintiff does not attempt to support her contention that Connell and Graham are appropriate salary comparators by referencing her alleged multi-site experience managing the Burbank facility. Any multi-site duties performed by Plaintiff as HR Generalist do not appear to have been substantial enough to make Connell and Graham appropriate comparators at this stage of the analysis, and such an argument is not here advanced.

is also supported by the fact that the compensation classification for the new position was retooled as well. The previous HR Generalist position had been classified as belonging to salary Band Three, while the new version was classified as a salary Band Four job. The modified salary range for the new position was between $50,000.00 and $80,000.00, while the uncontradicted evidence indicates that the prior position had a modified range of between $ 40,000.00 and $70,000.00. Defendant increased compensation for the position because of the added responsibilities of the new HR Leader position. The Court recognizes that nominal or other superficial changes in a position do not necessarily render a job unfit for comparison at the plaintiff's prima facie stage of the analysis. Cf. Walton v. Cowin Equipment Co., Inc., 774 F. Supp. 1343, 1345 (N.D. Ala. 1991) (Acker, J.) ("Job titles can be very misleading tools for making job comparisons.") Nonetheless, based on the added and more onerous responsibilities attending the newly-fashioned HR Leader position, the Court concludes that Plaintiff's HR Generalist job was not "substantially similar." Therefore, Plaintiff's prima facie case must fail with respect to Connell and Graham.

Plaintiff also contends that Hart is a proper comparator for the HR Generalist position. In response, Defendant argues that "Plaintiff was not placed in Hart's former position, but in a newly defined position." Defendant's Reply Brief, p. 6. However, as discussed supra, the HR Generalist position vacated by Hart was actually expanded as it was assumed by Plaintiff. ("When Hart left Anniston, Nichols decided to replace the HR Generalist and the HR Coordinator with only one position." Defendant's Brief in Support of its Motion for Summary

Judgment, p. 5).  The Court concludes that Plaintiff has demonstrated that she received a substantially lower salary than Hart, a white female, for work that was, at the very least, equally as onerous.  Therefore, Plaintiff can make out a prima facie case of wage discrimination in the HR Generalist position, vis a vis Melissa Hart.

Under the McDonnell Douglas ping-pong analysis, a valid prima facie case creates a presumption that discrimination has occurred. Walker v. Mortham, 158 F.3d 1177, 1183-84 (11th Cir. 1998) (citing Burdine, 450 U.S. at 254 n.7).  Defendant offers as its reason for setting and keeping Plaintiff's salary far below Hart's the following: "Because [Glover] lacked the minimum education and HR Generalist experience, and was expected to grow in the role, Plaintiff's pay was set at the low end of the HR pay scale."  Defendant's Brief p. 7. Hart testified that, prior to her transfer to Phoenix, she and Nichols discussed the issue of setting Plaintiff's compensation in the HR Generalist position. Hart noted that, in general, for an HR position a candidate's "talent," "experience," "education," "past performance record," relevant "recruiting market," and cost of living adjustments are the primary factors considered in setting compensation. Hart Depo, Tab "C," pp. 56-57 Plaintiff's Evidentiary Submission. However, Hart further testified that, in Plaintiff's case, Plaintiff's educational background was the "key criteria" [sic] considered in setting her base salary. See Hart Depo. Pp 56-57.  As education is undoubtedly a permissible basis upon which an employer may "discriminate" with respect to compensation, see, e.g., Wright v. Southland Corporation, 187 F.3d 1287, 1289 (11th Cir. 1999), the Court concludes that Defendant has satisfied its burden at this

intermediate stage of the analysis.

Thus, Plaintiff's first wage discrimination claim comes down to the third and final stage of the McDonnell Douglas analysis: pretext.  In order to survive summary judgment, Plaintiff must provide sufficient evidence to allow a reasonable fact finder to conclude, at a minimum, that the Defendant's proffered reason for treating the plaintiff differently was not the actual motivation for its decision.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1998), cert. denied, 118 S. Ct. 685 (1998).  Plaintiff may do this (1) by showing that the employer's legitimate nondiscriminatory reason should not be believed; or (2) by showing that, in light of all the evidence, a discriminatory reason more likely motivated the decision. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). See also, Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) (holding that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated," but cautioning that such a showing may not always be adequate to sustain a finding of unlawful discrimination.).  Our job as a Federal Court is not to review the wisdom of Defendant's business strategies but to determine whether a defendant has proffered an honest and permissible basis for its behavior. See, e.g., Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (citations omitted).  Further, a "plaintiff is not allowed to recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." Id.  Thus, "[p]rovided that the proffered reason is one that might

motivate a reasonable employer, an employee must meet that reason head-on and rebut it, and the employee cannot succeed simply by quarreling with the wisdom of that reason." Id.

Plaintiff marshals several arguments to demonstrate pretext. First, Plaintiff argues that her lack of a college degree had no bearing on Defendant's decision setting Plaintiff's compensation level because a college degree was not a required, but merely a "preferred," attribute for holding the HR Generalist position. Plaintiff offers a variation of that argument, that Defendant "recognizes that experience is the equivalent of a degree," and, because Hart and Plaintiff were on a more equal footing if years of experience and years of formal education are viewed as fungible, that Defendant's proffered reason for the compensation disparity is pretextual.

Plaintiff also argues that Connell should not have been paid much more than Plaintiff based on his holding a college degree, because his degree was in forensic science and from a university from which Defendant did not regularly recruit. The thrust of this argument is that, because Connell's degree does not relate to human resource management, and because the school is not one from which Defendant usually recruits,[19] Defendant cannot be believed when it asserts that it paid Connell $77,000.00 simply because he held some college degree. Plaintiff also argues that because Randall Macintosh earned more than Plaintiff and for at least some time did not hold a college degree Plaintiff further can demonstrate pretext.

Plaintiff next argues that she had experience greater than or equal to Connell, Graham

---

[19]Higgins Depo. p. 251-252.

and Hart, and that Plaintiff excelled in the HR Generalist position.  In addition, as Plaintiff

argues that the salary minimum for the HR Generalist position was $50,000.00, and that,

because she was paid less than that amount for most of her tenure as HR Generalist, that such

is also evidence of pretext.[20]  Finally, Plaintiff argues that the salary raise she received in the

Spring of 1999, bringing her base salary up to $60,000.00 was an "admission that Plaintiff

was underpaid in relation to her white peers and is extremely compelling evidence of race

discrimination."  Plaintiff's Brief, p. 62.

Plaintiff's argues that Defendant's promoting her into the job is evidence of pretext

The Court rejects this argument.  The Court would agree that Plaintiff's having held the HR

Generalist position for two and a half years does serve as evidence that she was minimally

qualified for the position.  See, e.g., Crapp v. City of Miami Beach, 242 F.3d 1017, 1020 (11th

Cir. 2001) (quoting Rosenfield v. Wellington Leisure Products, Inc., 827 F.2d 1493, 1495 n.2

(11th Cir. 1987) ("[I]n case where a plaintiff has held a position for a long time, qualification

for that position sufficient to satisfy the test of a prima facie case can be inferred.")  However,

merely being minimally-qualified for the HR Generalist position has no bearing on an

employee's relative level of compensation once placed into the position.  If the job listing for

the HR Generalist position indicated, as Plaintiff contends, that a college degree was

"preferred" but not required, that would suggest that, while not a necessary precondition to

---

[20]As discussed supra, n. 4, Plaintiff fails to cite any evidence that the salary range within
Band Three for the HR Generalist position during Plaintiff's tenure had a floor of $50,000.00.  Even
if such evidence did exist, the Court is unsure of how it would tend to show pretext, that Defendant
did not pay Plaintiff less than Hart for the reason proffered.

holding the HR Generalist post, the "preferred" attribute would surely have been a basis for additional compensation.

With respect to Plaintiff's argument that Defendant "recognizes that experience is equal to a degree," the evidence simply does not support a finding that Defendant espoused unconditional adherence to such a sweeping maxim. Plaintiff testified that "in general, if a job posting calls for a particular degree, there is almost always an equivalent to that degree, equivalent being number of years of experience." Glover Depo. pp. 69-70. The HR Generalist position was not posted prior to Plaintiff's assumption of it. However, an examination of other job postings reveals that experience is not always valued equally as education. In the August 1999 HR Generalist job posting, there is no mention of any number of years of experience that could "substitute" for years of education, or for a degree. In contrast, the job description for the Customer Service Representative position, listed the following under the "job description" heading: "Bachelor's degree in business related field plus 1-2 years experience in customer service, or 6 to 8 years directly related experience may be substituted for the specified formal education when the experience yields the same level of knowledge." Even in the latter scenario, however, the job posting merely states that an applicant can feel at ease that she is minimally-qualified for the position if she has the requisite level of experience yet lacks a college education. It does not mandate, or even suggest, that Defendant would *compensate* any selected applicant the same as any other. Rather than Plaintiff's articulation of Defendant's policy, "education equals experience," a

more accurate version would be as follows: "In certain situations, Defendant will consider experience as a substitute for education with respect to qualifying minimally for a position. But, even in such cases, Defendant may compensate candidates differently, taking into consideration variables such as the candidate's level of education." In short, Defendant may "discriminate" among qualified applicants based on preferred criteria such as level of education, and appears to have done just that in the instant case.

As stated above, Connell and Macintosh did not perform work requiring "substantially the same responsibility" as Plaintiff. Nonetheless, their salaries could be used at the pretext stage if Plaintiff were attempting to show that, with respect to their appropriate comparators, Connell and Macintosh were paid the same despite educational deficits. Such evidence could be probative of Defendant's proffered value placed on education in setting compensation levels. However, Plaintiff has not presented such further evidence. Connell held a college degree and was compensated more than Plaintiff for a job requiring substantially greater and different responsibilities. Macintosh did not hold a college degree, but performed an entirely different job. Without more, this evidence does not tend to demonstrate pretext.

Plaintiff's argument that her June 1999 salary increase was actually an "admission" of prior discrimination also fails. Plaintiff's data revealing discrepancies between her salary and the salaries of others in the organization lists only other "officials and managers." It says nothing about the salaries of other similarly-situated employees.[21] The data compiled by

---

[21]The absence of other comparators' salaries is puzzling. It appears that Plaintiff was aware of other HR Generalists, such as Ian Wilson and Drew Hoffman, and made no apparent attempt to

Plaintiff also says nothing regarding the level of education or experience possessed by each member of the reference group. Plaintiff's raise was not an admission by Defendant that she was being paid a discriminatory wage. Rather, it was an attempt by Defendant to address a grievance. Even if it was admission that Plaintiff was, as a general matter, "underpaid," it does not suggest that Defendant had been animated by an improper motive when it set or chose to maintain Plaintiff's salary throughout her tenure as HR Generalist.

Plaintiff's various arguments for pretext fail to meet "head on" Defendant's proffered reason for Plaintiff's relatively low salary as an HR Generalist, namely that Plaintiff had no more than a high school education while her predecessor, Hart, held an M.B.A. Plaintiff's arguments mostly can be categorized as incongruous rejoinders that quibble with the wisdom of placing such a large premium on education when it seems to Plaintiff that she was equally as capable of performing the job as her more extensively-educated peers.[22] Plaintiff fails to demonstrate that Glover received less compensation due to her race – she offers nothing that could demonstrate that Defendant's explanation for Plaintiff's pay is merely a pretext to hide actual discrimination, given Plaintiff's vastly inferior level of formal education. Accordingly, Defendant's motion for summary judgement on Plaintiff's HR Generalist Title VII wage

---

examine their salaries and levels of education. EEOC Position Statement of Allied Signal, p. 6, Tab G to Plaintiff's Evidentiary Submission, Ex. 2.

[22]A couple of additional arguments presented by Plaintiff so obviously fall into this category of merely taking issue with Defendant's business strategies that the Court gives them no further attention. See Plaintiff's Brief, pp. 60-61 (arguing that Plaintiff is better qualified than Connell, Graham and Hart despite Plaintiff's lack of education; arguing that Defendant's compensation practices are inconsistent with its "pay for performance" policy).

discrimination claim is due to be GRANTED.

B. Discriminatory Promotion and Demotion Claims

Plaintiff alleges that she was twice not awarded the consolidated HR Generalist job, a promotion, because, in substantial part, of her race. In addition, Plaintiff claims that she was transferred, ostensibly a demotion, also on account of her race. For the reasons stated below, the Court finds that Defendant's motion is due to be GRANTED with respect to all three of Plaintiff's promotion or demotion claims.

1. August, 1999 Promotion Claim

Plaintiff offers evidence that she claims proves directly that she was not promoted and was demoted because of her race. In early August 1999, Williams told Plaintiff that her job and the same position at Defendant's other Anniston location would be combined into one position serving both sites. Williams told Plaintiff that he had considered Connell, the HR Generalist for the other Anniston site, and Plaintiff for the new position and that he was awarding it to Connell. Also, Williams told Plaintiff that she could either accept a new job as Customer Service Account Manager, or she would be terminated. Williams allegedly told Plaintiff that she was not selected for the new position because she did not "fit the profile," presumably of the new position. Plaintiff also alleges that Williams told her a "sorry story about the South, and how far the South had to come." Glover Depo. p. 182. Williams also asked Plaintiff whether "she was upset because she was being replaced by a white male." Errata Sheet, Tab "I" of Plaintiff's Evidentiary Submission at p. 4.

The statements cited by Plaintiff do not constitute direct evidence of discrimination. "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quotation omitted).  Plaintiff does not testify that Williams was referring to the new HR Leader position when he made the "profile" comment.  Also, it is clear that each of Williams's three comments is subject to multiple interpretations.  The "profile" comment could have meant many things other than the meaning Plaintiff ascribes to it.  Williams could just as likely have been referring to the "preferred educational profile," rather than the racial profile. Not one of Williams's comments could allow a jury to conclude directly that Plaintiff was not promoted or was transferred due to her race, without employing at least one inference. However, direct evidence is not inferential; it is "evidence which if believed proves the existence of the fact in issue without inference or presumption." Burrell v. Bd. of Trustees of Ga. Military College, 125 F.3d 1390, 1393 (11th Cir. 1997) (citation omitted).  Since Plaintiff has not presented direct evidence sufficient to create an issue of material fact, the Court evaluates her claims under the "circumstantial evidence" rubric of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

To establish a prima facie case of discriminatory failure to promote, Glover must establish that: (1) she is a member of a protected group, (2) she was in fact passed over for a promotion, (3) she was qualified for the higher position, and (4) an individual outside of the protected class was given the higher position. See Standard v. A.B.E.L. Services, Inc., 161

F.3d 1318, 1333 (11th Cir. 1998).

Defendant does not dispute, and the Court agrees, that Plaintiff has made out a prima facie case with respect to the promotion opportunity for the consolidated HR Generalist position awarded to Connell. Instead, Defendant argues that Connell was promoted because of his superior education and his broader and deeper experience in the field of human resource management. Connell held a bachelor's degree in forensic science from Jacksonville State University. Plaintiff held only a high school diploma. Connell had served as HR Generalist at Defendant's OEM facility in Anniston for two years at the time of the promotion. In addition, Connell had at least six years of human resource management experience prior to his joining Defendant. Glover had held the HR Generalist position at the R&O facility for two and a half years at the time of the job consolidation. That time period was Plaintiff's only formal human resource management experience, although she maintains that during her tenure as HR Coordinator she performed the same duties as the HR Generalist. The Court concludes that Defendant has satisfied its burden of producing legitimate, nondiscriminatory reasons for selecting Connell.

Plaintiff contends that Defendant's proffered reasons for selecting Connell are a pretext for racial discrimination. Plaintiff argues that the process by which she and Connell were evaluated for the position was stacked against her, in that her positive attributes were given relatively little weight and her negative attributes were given disproportionately great emphasis. Plaintiff further argues that Williams's comments regarding Plaintiff's fitting "the

profile," the "sorry story about the South," and asking whether she was upset because she was being replaced by a white male also show a discriminatory animus in selecting Connell. Plaintiff argues that she was "substantially more qualified" than Connell for the position. Plaintiff rounds out her pretext arguments by stating again that Connell's degree from Jacksonville State "is irrelevant to his selection" for the position.

Plaintiff has failed to demonstrate pretext with respect to this failure to promote claim. Plaintiff's argument with respect to Connell's education is normative rather than factual – essentially her argument boils down to her opinion that Connell's college degree *should not have been* accorded significant weight in the selection process rather than evidence contending that Defendant *did not actually* accord Connell's education significant weight. Plaintiff completely fails to cast any doubt on Defendant's contention that it chose Connell because of his superior educational background.

Plaintiff's arguments that Connell was less well-qualified for the position because he had supervised a facility that employed fewer people and because she had "multi-site experience" due to her involvement in Defendant's Burbank, California site do not demonstrate pretext. Connell had six more years of formal human resource managerial experience than did Plaintiff, and possessed the "preferred" attribute of holding a bachelor's degree. In addition, Plaintiff's evidence that she had "multi-site experience" is so vague that it is of little value. Plaintiff's argument that Connell lacked experience in supervising sites with over fifty employees is also not supported by the evidence. Prior to joining Defendant's

organization, Connell had held human resource positions supervising over 1,000 employees. No reading of the evidence adduced suggests that Plaintiff was more qualified than was Connell for the position, "substantially" or otherwise.[23]

Moreover, Williams's stray remarks to Plaintiff are so vague and ambiguous that they add nothing to her argument regarding pretext.[24] They were made almost two months after the decision to eliminate the two HR Generalist positions was made, and some time after Connell was selected to fill the newly-consolidated position. Not only are such comments not direct evidence of racial discrimination, see supra, they are not probative circumstantial evidence of such discrimination.[25]

Finally, Plaintiff's allegations of lopsided consideration for the position are not

---

[23]Plaintiff argues in her brief that Defendant misconstrues Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000) by citing the case for the proposition that "an employee can prove pretext in a job placement context by proving that she is substantially more qualified than the person awarded the position." Plaintiff's Brief p. 72. Lee does in fact state that, where a plaintiff attempts to demonstrate pretext by reference to disparate qualifications alone, such disparity must be "substantially more qualified." In the instant case Plaintiff has not presented evidence that she was equally as experienced as Connell, so we need not decide whether she was "substantially" more qualified.

[24]Plaintiff does not remember any of the details of the "sorry story about the South" allegedly told to her by Williams. In addition, the "profile" comment could just as easily have referred to Defendant's preferred educational profile for the new position. As to the comment included in Plaintiff's errata sheet, regarding Plaintiff's feelings about being replaced by a white man, it seems most likely that Williams was aware of Plaintiff's sensitivity regarding her race, as Plaintiff's position on the matter was salient after her recommendations in preparation of the Department of Labor audit. Asking whether Plaintiff was upset about her replacement does not constitute an admission of racial discrimination in the promotion process.

[25]Also, Williams was, at most, one of several decision makers with respect to the reduction in force and Connell's promotion. See "Reduction-in-Force Request Sheet," Tab "J," Defendant's Evidentiary Submission.

responsive to the reasons advanced by Defendant for promoting Connell over her. The adverse action suffered by Plaintiff is that she did not receive the promotion, not that she did not receive adequate consideration for the position. Even if the evaluation process was unfairly tilted against Plaintiff, that evidence does not rebut "head on" Defendant's reasons for its behavior. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (quotation omitted). Like Plaintiff's protestations regarding Defendant's valuation of Connell's college degree, such an argument merely amounts to quarreling with the wisdom of Defendant's decision. Plaintiff has failed to introduce evidence sufficient to permit a fact finder to disbelieve Defendant's proffered reasons for promoting Connell instead of Plaintiff. As Plaintiff has not met her burden with respect to establishing that Defendant's proffered reasons for not promoting her were a pretext for race discrimination, Defendant's motion for summary judgment is due to be GRANTED with respect to Plaintiff's August 1999 promotion claim.

   2. November, 1999 Promotion Claim

   In November 1999 Connell resigned from the consolidated HR Leader position. The opening was posted, and Plaintiff, Ken Harness (a white male) and Wendy Graham (a white female) applied for the position. Plaintiff was not interviewed for the position; both Harness and Graham were interviewed. Graham was awarded the position.

   As discussed supra, Plaintiff is able to make out a prima facie case of discrimination with respect to her failure to be promoted in November 1999. Defendant offers as its

legitimate, nondiscriminatory reasons for selecting Graham her superior education and broader experience in human resource management. Graham possessed an M.B.A. from Cornell University with a concentration on human resource management, had taken graduate-level human resources and statistics classes at DePaul University and Northwestern University, and had earned a bachelor's degree from Bates College in Maine. Defendant also cited Graham's broader experience as having factored into its decision to promote Graham. Defendant has thus met its burden at this stage of the analysis.

Plaintiff's second promotion claim therefore comes down to the third and final stage of the McDonnell Douglas pavane: pretext. Plaintiff's main pretext argument is that Graham possessed less management experience than Plaintiff, as Graham had served as an HR Generalist for one and a half years while Plaintiff had served as HR Generalist for two and a half years. Plaintiff has not presented any argument relating to Defendant's proffered "superior education" justification.[26] Even if Plaintiff's "experience" argument might serve to create a disputed material fact capable of rebutting Defendant's proffered reason for promoting Graham, Plaintiff's failure to address and, therefore, rebut Defendant's "education" justification is fatal to her ability to carry her burden of demonstrating pretext. See Combs v. Plantation Patterns, 106 F.3d 1519, 1539 (11th Cir. 1997) (record evidence must be

---

[26]If Plaintiff intended to argue that the "education" reason was pretext because Plaintiff possessed the minimum qualifications for the position without a college degree or an M.B.A., or that, since she had already held the HR Generalist position and succeeded in it, Graham's far superior education should not have mattered, these arguments are rejected for the same reasons stated supra with respect to Plaintiff's first promotion claim.

submitted such that a fact finder would be permitted to reject *each* of defendant's proffered reasons for its decision) (emphasis added).

Plaintiff also makes much of the fact that she was never interviewed for the position, while Harness and Graham were. However, as the Court noted in its analysis of Plaintiff's first promotion claim, that fact, even if true, does not serve to rebut Defendant's proffered reason for its action. The fact that Plaintiff was given less consideration or even no consideration at all is not probative of whether Defendant actually promoted Graham because she held an M.B.A. from an Ivy League university with the preferred concentration, or whether such explanation was a pretext for race discrimination. Plaintiff has failed to introduce evidence sufficient to permit a fact finder to disbelieve Defendant's proffered reasons for promoting Graham instead of Plaintiff. As Plaintiff has not met her burden with respect to establishing that Defendant's proffered reasons for not promoting Plaintiff were a pretext for race discrimination, Defendant's motion for summary judgment is due to be GRANTED with respect to Plaintiff's November 1999 promotion claim.

### 3. Plaintiff's Discriminatory Demotion (Transfer) Claim

After Plaintiff's HR Generalist position was combined into a new position, and Defendant awarded the new position to Connell, Plaintiff began working as a Customer Service Account Manager. Plaintiff claims that she was given the Hobson's choice of either being terminated or accepting the transfer, and that the transfer represents a demotion. Plaintiff argues that she was demoted, in substantial part, due to her race.

To establish a prima facie case of discriminatory demotion, a plaintiff must satisfy four elements: (1) that she was a member of a protected class, (2) that she was qualified for the position, (3) that she suffered an adverse employment action, and (4) that she was replaced by someone outside that protected class. See Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821, 828 (11th Cir. 2000) (citations omitted). Defendant appears to concede that Plaintiff is able to satisfy the first, second and fourth tines of the analysis. Rather, Defendant argues that Plaintiff's prima facie case fails because Plaintiff suffered no "adverse employment action."

In a Title VII case, a transfer to a different position can be "adverse" if it involves a reduction in pay, prestige, or responsibility. Doe v. DeKalb County Sch. Dist., 145 F.3d 1441, 1448 (11th Cir. 1998). Although Plaintiff's base salary was not reduced with the transfer, it is undisputed that there was room for salary growth in the HR Generalist position that was eliminated when Plaintiff transferred. Even under Defendant's definition of the salary range available to an HR Generalist, the ceiling for that position was at least $70,000.00. The Customer Service Account Manager position topped out at $60,000.00 – Plaintiff's salary when she first transferred until the time this suit was filed. Also, in her HR Generalist position, Plaintiff was a "Team Leader," and was a member of a "Leadership Team." The Leadership Team had approximately seven other members, each of whom was a leader for her respective department. In the Customer Service Account Manager position, Plaintiff began reporting to Macintosh. In her prior job, Macintosh had been her "peer" on the Leadership

Team. The Court agrees with Plaintiff that the transfer from HR Generalist to Customer

Service Account Manager entailed a loss of job prestige. Also, while it difficult to compare

the work involved with each position, Defendant concedes that "Plaintiff has been transferred

to a less burdensome position, at the same rate of pay." It appears that the Customer Service

position is "less burdensome" precisely because it is not a leadership position, and does not

carry with it the prestige and extra work engendered by such a position. The Court concludes

that Plaintiff has presented ample evidence to support a finding of fact that Plaintiff's transfer

bore all of the relevant indicia of inferiority and that the move constituted a "demotion."

Thus, Plaintiff has made out her prima facie case.

Defendant argues that it transferred Plaintiff because her former job no longer existed,

and, presumably, the Customer Service position was the most appropriate available position.[27]

It is undisputed that Defendant did in fact combine the two HR Generalist positions and that

Connell was awarded the new position. Plaintiff's former position ceased to exist, and its

---

[27]In her papers submitted to this Court Plaintiff has presented her claims in a somewhat confusing manner, allowing analyses to blend into one another. The analysis of Plaintiff's first failure to promote claim and her discriminatory demotion claim is the primary locus of this conflation and consequent confusion. Perhaps this is because both claims flow from the same general personnel shuffling action – Plaintiff being passed over for the promotion and transferred. Plaintiff at times attempts to make out pretext on the demotion claim by referring to Plaintiff's level of education, level of experience, or caliber of performance in the HR Generalist position. However, these arguments are inapposite with respect to the demotion claim; rather, they go to Plaintiff's promotion claims. In order for Plaintiff's demotion claim to have any additional legal "value," it must be analyzed in the following manner: Defendant's proffered reasons for demoting Plaintiff would seem to be that business necessity mandated that the two HR Generalist positions at Defendant's two Anniston sites be combined into a single position, and that, because Plaintiff did not receive that new position, there was no other available position appropriate for her aside from the Customer Service position. Otherwise the demotion claim overlaps Plaintiff's promotion claims entirely and is pure surplusage.

duties and responsibilities were absorbed into a new job. The Court concludes that Defendant

has met its burden, proffering a legitimate, non-discriminatory reason for Plaintiff's demotion.

Therefore, Plaintiff's demotion claim depends on the existence of pretext. The only

argument that Plaintiff advances to demonstrate pretext is that the new HR Leader position

did not actually replace the two separate HR Generalist positions.[28] Plaintiff claims that the

reduction in force was a sham – a pretext for racial discrimination. As support for this

contention, Plaintiff cites to evidence that Laurie Feicht (a white female) was hired as HR

Generalist for one of Defendant's Anniston sites in April of 2000.[29]

Though Plaintiff claims that Feicht was hired as HR Generalist in April of 2000, the

hiring document referred to by Plaintiff actually lists April 30, **2001** as the start date of the

position. Tab "G," Ex. 35 to Plaintiff's Evidentiary Submission. The HR Manager's

signature is also dated April **2001**. Id. Regardless of whether Feicht was hired eight months

or twenty months after Plaintiff's position was eliminated, the Court concludes that no

reasonable fact finder could infer from this lone piece of evidence that Defendant intended

such an elaborate ruse back in August 1999, the date Plaintiff's position was eliminated, as

---

[28]Plaintiff does not challenge the legitimacy of the business necessity that prompted the consolidation. Plaintiff also does not allege that other positions existed at Honeywell that were more suitable for her.

[29]The document referenced by Plaintiff, entitled "Hiring Justification Sheet," does not explicitly indicate whether Feicht was hired for the R&O or OEM site. However, because it indicates that the individual was not an employee of the R&O facility, and also indicates that no relocation was necessary, it can be assumed that she was hired for the OEM facility. The Court applauds Plaintiff on this, another example of the unparalleled clarity with which the evidence has been presented in this litigation.

a pretext for racial discrimination. Cf. Cruz-Ramos v. Puerto Rico Sun Oil Co., 202 F.3d 381, 384 (1st Cir. 2000) (commenting that a hiring that took place three years after a reduction in force had no probative value as to the pretextuality of the defendant's reason for terminating plaintiff). The Court concludes that Plaintiff has failed to adduce evidence sufficient to show that the reasons offered by Defendant for the decision to transfer/demote Plaintiff are but a pretext for race discrimination. Accordingly, Defendant's motion for summary judgment is due to be GRANTED as it pertains to Plaintiff's demotion claim.

C. Plaintiff's Retaliation Claims

    1. Retaliatory Demotion

Plaintiff also claims that Defendant demoted her to Customer Service Account Manager representative in retaliation for her having participated in protected activity. Specifically, Plaintiff argues that her frequent complaints regarding her relatively low salary constitute "protected activity." Plaintiff claims that Defendant retaliated against her for her salary gripes by transferring/demoting her. Assuming Plaintiff could make out her prima facie case of retaliatory demotion, the Court concludes that Plaintiff is unable to rebut Defendant's legitimate non-discriminatory reason for the transfer under the same rationale detailed supra. Therefore, the Court finds that Defendant's motion for summary judgment is due to be GRANTED with respect to Plaintiff's retaliation claim.

    2. Retaliatory "Failure to Consider"

Plaintiff also claims that Defendant retaliated against her when Williams did not alert Thompson, the manager apparently in charge of scheduling interviews for the new HR Leader

position, that Plaintiff had applied.

Plaintiff is not able to make out a prima facie case of retaliatory "failure to consider." First, the HR Leader job application process was at the end of November 1999. The internal audit, Plaintiff's complaint, and consequent pay raise occurred in June 1999 – almost six months prior to the Defendant's alleged failure to consider Plaintiff for the promotion. Six months between the last allegedly protected activity by the Plaintiff and the alleged retaliation is too remote in time to allow the inference of causal connection to be drawn fairly. See, e.g., Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998) (five month period between protected expression and adverse employment action does not suggest a causal link). Cf. Taylor v. Canteen Corp., 69 F.3d 773, 781 (7th Cir. 1995) (fact that various jobs became available four months after plaintiff was terminated in RIF did not serve as evidence that Plaintiff's termination was pretextual since the subsequent availability of jobs did not indicate that similar positions were available when the RIF occurred); Legendre v. Chase Manhattan Bank, 1996 WL 514874, at *1, *6 (S.D.N.Y.) (eight months too remote between employer's discriminatory comments and plaintiff's subsequent termination to infer intent).

Also, as discussed supra, Plaintiff cannot demonstrate that she suffered an "adverse employment action," in that Plaintiff has been unable to show that she would have had any chance of actually receiving the HR Leader position awarded to Graham. Plaintiff cites Graham v. State Farm Mutual Ins. Co., 193 F.3d 1274, 1283 (11th Cir. 1999) in support of her argument that she has suffered a cognizable adverse employment action in not being

referred for an interview. First, *Graham* is of questionable value in the instant case, as it was not Williams who was the decision-maker with respect to the HR Leader position. The evaluation process was performed by a panel of six or seven mangers, and Williams was not a member of this panel. Nonetheless, *Graham* also states that "some threshold level of substantiality . . . must be met for unlawful discrimination to be cognizable under [Title VII's] anti-retaliation clause." Id. The Court finds that Williams's failure to alert Thompson that Plaintiff applied for the HR Leader position does not rise to the level of "substantiality" required under Title VII in light of the fact that Plaintiff cannot demonstrate a disputed issue of material fact as to whether Defendant would have selected her. Because Plaintiff is unable to make out a prima facie case of retaliation with respect to Williams's failure to tell Thompson that Plaintiff had applied for the position, the Court concludes that Defendant's motion for summary judgment is due to be GRANTED as to this claim.

## IV. CONCLUSION

Defendant's Motion to Strike Plaintiff's errata sheet (Doc. No. 59) is due to be DENIED. The Court has considered Plaintiff's errata sheet to the extent it is material and relevant to the issue before the Court. Based on the foregoing, including my consideration of all Plaintiff's objected-to evidence, the Court concludes that Defendants' motion for summary judgment (Doc. No. 43), is due to be GRANTED with respect to all claims advanced by Plaintiff. The Court finds no genuine issue of material and triable fact as to such claims and that Defendant is entitled to judgment as a matter of law.

**DONE and ORDERED this _28th_ day of February, 2002.**

_____

**H. DEAN BUTTRAM, JR.**
**UNITED STATES DISTRICT JUDGE**